UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SCCI HOSPITALS OF AMERICA, LLC
d/b/a KINDRED HOSPITAL NORTHERN
INDIANA,

                    Plaintiff,

          v.                                                    CAUSE NO. 3:18-CV-863 DRL

HOME-OWNERS INSURANCE CO. *et al.*,

                    Defendants.

## OPINION & ORDER

Home-Owners Insurance Company moves to exclude opinion testimony of SCCI Hospitals of America, LLC d/b/a Kindred Hospital Northern Indiana's medical causation witness, Dr. Drayton Graham, arguing the opinion is unreliable and unhelpful under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The court denies the motion.

## BACKGROUND

The morning of September 25, 2017, a 35-year-old woman, identified as "the patient" in the complaint, was driving in Michigan, talking on the phone with her husband, and telling him that she felt dizzy. Shortly after, though it remains unclear how long, the patient was involved in a significant car accident. She veered into oncoming traffic, off the road, and accelerated from 49 to 56 miles per hour before crashing headfirst into a utility pole. Her vehicle's crash computer recorded the collision at 8:23 a.m. When paramedics arrived at 8:30 a.m., the airbags had deployed, and the patient remained in the driver's seat—unresponsive, without a pulse, wearing her seatbelt.

Extracting her from the vehicle, paramedics started cardiopulmonary resuscitation (CPR) at 8:31 a.m. and defibrillated her at 8:34 a.m. after noting the presence of ventricular fibrillation (VF)— a dangerous abnormal heart rhythm when the lower heart chambers stop pumping blood to the body,

which can lead quickly to death without treatment.[1] She was taken to the local emergency room and admitted for VF cardiac arrest. She was transferred to the University of Chicago's Neuro ICU where her care was medically complex before being transferred to Kindred Hospital Northern Indiana for long-term care. Treatment for damage to her brain from oxygen deprivation after the cardiac event, as well as other complications, required her to remain at Kindred until May 29, 2018.

The patient, insured through her husband by Home-Owners, submitted a claim under her Michigan no-fault automobile insurance policy for the costs incurred (including medical costs) from the accident. Home-Owners investigated the claim, concluded that the patient's cardiac event occurred before the accident, and denied the claim for medical expenses related to cardiac arrest and anoxic brain injury.

The patient's insurance benefits were assigned to SCCI, who does business as Kindred Hospital and who pursued this suit. Kindred retained Dr. Drayton Graham, a board-certified critical care pulmonologist and internist, to review the patient's medical records and other materials related to the accident. Dr. Graham concluded that the patient's cardiac event was caused by blunt force trauma and occurred after the accident, and that Kindred's medical care was clinically necessary. Home-Owners challenges the reliability and helpfulness of this opinion.

STANDARD

A witness may testify in the form of an expert opinion when (1) the witness is "qualified as an expert by knowledge, skill, expertise, training, or education;" (2) the testimony is "based on sufficient facts or data;" (3) the testimony is "the product of reliable principles and methods;" and (4) the witness has "reliably applied the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.

---

[1]   Mayo Clinic, *Ventricular fibrillation*, https://www.mayoclinic.org/diseases-conditions/ventricular-fibrillation/symptoms-causes/syc-20364523 (last visited Nov. 10, 2021).

R. Evid. 702. Although analysis under Rule 702 remains at all times flexible, *Daubert*, 509 U.S. at 594, the fundamental considerations of what makes expert opinion admissible are well understood, *see Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp.3d 965, 970-71 (N.D. Ind. 2020).

In short, the Federal Rules of Evidence strike a balance between two competing concerns: the apprehension for the free-for-all admission of unreliable theories that might baffle juries and a "stifling and repressive scientific orthodoxy" that might inhibit new truths or legitimate cases. *Daubert*, 509 U.S. at 596. While preserving that balance, the *Daubert* analysis is not a substitute for crossexamination, contrary and compelling evidence, thoughtful jury instructions, and other methods inherent in federal trials to challenge shaky evidence. *Id.*; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

The court needn't conduct an evidentiary hearing here. No party has requested one. The briefing, proffered expert reports, medical records, accident report, exhibits, and deposition testimony also permit the court to rule. *See, e.g., Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998); *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998).

DISCUSSION

This case presents largely a single question for trial next month: whether the patient's cardiac arrest and subsequent anoxic brain injury, precipitating then a great deal of treatment and cost, occurred before the accident or because of the accident. Dr. Graham proposes to testify that her injuries occurred as a result of the accident—either from direct trauma to the patient's chest or from the biophysical trauma of being in a significant car accident. Home-Owners says this opinion isn't helpful, based on sufficient facts or data, or methodologically reliable.

A.     *Dr. Graham's Opinion Will Help the Jury Decide an Issue of Consequence.*

A court should exclude testimony unless it speaks, without confusing or misleading the jury, to a relevant issue that the jury must decide. *See* Fed. R. Evid. 403, 702; *see, e.g., Hartman v. EBSCO Indus.*, 758 F.3d 810, 819 (7th Cir. 2014). To be helpful, the opinion must aid the jury to decide an issue of consequence. The court must determine whether an expert's "reasoning or methodology properly can be applied to the facts in issue," *Daubert*, 509 U.S. at 593, and whether the witness's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a). Opinions must be tied to case facts and issues. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). This is what is commonly called fit. *See Daubert*, 509 U.S. at 591.

An opinion must be "something more than what is obvious to the layperson," *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) (internal quotation omitted), though an "opinion may overlap with the jurors' own experiences or cover matters that are within the average juror's comprehension, so long as the expert uses some kind of specialized knowledge to place the litigated events into context," *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 484 (7th Cir. 2020), *cert. denied,* 141 S. Ct. 2877 (2021) (internal quotations and alterations omitted). Home-Owners argues that Dr. Graham's testimony won't assist the jury because it is based on common sense, basic logic, and what everybody knows already. Kindred responds that some of an expert's testimony can be within the scope of a lay jury's knowledge, but that Dr. Graham used phrases such as "common sense" and "logic" in the context of medical expertise, not in the lay sense.

Dr. Graham is a medical doctor with almost fifty years of experience. After his undergraduate degree at Columbia College, he graduated from Harvard Medical School in 1973. He completed his internship and residency in internal medicine at Harbor UCLA Medical Center and a separate fellowship in pulmonary disease there. He has worked at various hospitals over decades in practice and has held leadership positions at many. He is a board-certified pulmonologist who specializes in

pulmonary critical care and internal medicine. He regularly treats patients with cardiac arrest, including from trauma.

Unsurprisingly, his passing references to common sense and common knowledge are cast in light of his significant medical experience. He is plain spoken, but his opinion is no less erudite. For example, Dr. Graham testified that "everybody knows" that cardiac arrhythmia can be caused by chest trauma from an automobile accident because serious heart injury can occur from even lesser forces to the chest. "Everybody" wasn't meaningfully intended to mean the common layperson on the street. Though most every critical care pulmonologist or internist worth his or her salt may know this, it proves beyond a layperson's knowledge. What conditions, forces, or trauma may cause cardiac arrhythmia, or what the dynamics of cardiac arrhythmia are, well exceeds a typical jury.[2]

Dr. Graham also testified that it was "common knowledge" that an individual almost immediately loses consciousness upon ventricular fibrillation, thus the patient could not have been speaking to her husband or accelerating her vehicle when this event occurred. The latter may be understandable to a jury but only after the jury understands what ventricular fibrillation is, what effect it has on the human body, its relationship to consciousness and motor control, and the speed by which one precipitates the other. Despite Dr. Graham's plain verbiage, his concept of "common knowledge" is demonstrably common knowledge within the medical field—precisely the type of specialized knowledge for which an expert is needed. *See* Fed. R. Evid. 702; *Ancho*, 157 F.3d at 519.

Dr. Graham readily concedes that some of the underlying assumptions to his opinion are based on true common sense. For example, seatbelts restrain individuals and thus concentrate damage to the belted area [ECF 77-2 at 40], and high impact accidents impose more force on an individual

---

[2] An arrhythmia is any irregular heartbeat that occurs when cardiac electrical signals don't work properly. Mayo Clinic, *Heart arrhythmia*, https://www.mayoclinic.org/diseases-conditions/heart-arrhythmia/symptoms-causes/syc-20350668 (last visited Nov. 10, 2021). The deposition transcript identifies this word as "eurhythmia," but the context of the discussion suggests that this is a transcription error—in part, suggesting proof of the point.

than low impact accidents [*id.* 47-48]. Though these assumptions trend more toward the obvious, an expert opinion may touch on issues within a layperson's knowledge while providing specialized context for understanding how to connect the dots, to utilize that knowledge within a medical field otherwise foreign to the jury, and to understand how these assumptions may or may not translate to that area of expertise. *See Viamedia*, 951 F.3d at 484; *Ancho*, 157 F.3d at 519 (citing *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 205 (7th Cir. 1982)).

For instance, just because a layperson may understand that positive and negative charges attract doesn't mean she understands this dynamic within the context of the Large Hadron Collider. Just because a jury member understands the general principle of gravity doesn't mean he understands "that it causes an object to fall at the rate of 9.8 meters/second$^2$ (without regard to mass) or use that to calculate the impact force of a falling object on an individual." *Smith v. Nexus RVs*, 472 F. Supp.3d 470, 479 (N.D. Ind. 2020). A distinguishing feature of an expert is the ability to take the case's facts, synthesize them in light of the expert's specialized knowledge or expertise, and thereby aid the jury to reach a conclusion otherwise unreachable through its own devices, even if some of the building blocks touch on areas within the jury's common knowledge. *See Viamedia*, 951 F.3d at 484. In short, Dr. Graham's testimony, consistent with Rule 702 and despite his occasional plain-spoken verbiage, aids the jury here by providing medical knowledge for the jury to decide an issue of consequence—whether the patient's cardiac arrest and subsequent anoxic brain injury occurred before or because of the accident. His opinion is helpful under *Daubert*.

B.     *Dr. Graham's Opinion Is Based on Sufficient Facts and Data.*

An opinion witness must have a sound factual basis to be declared an expert. Fed. R. Evid. 702(b), 703; *Daubert*, 509 U.S. at 590. Even if eminently qualified, experts cannot offer opinions based solely on their say-so (what lawyers call *ipse dixit*). *See Kumho Tire*, 526 U.S. at 157; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert testimony must be based on sufficient and known facts. Fed R. Evid.

702; *Daubert*, 509 U.S. at 590; *see, e.g.*, *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (evidence of one sale was an insufficient basis to calculate an average of sales over twenty years); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904-05 (7th Cir. 2007) (excluding testimony because the "mere existence of a temporal relationship" was an unreliable basis to show a causal relationship between medication and symptoms without a physiological explanation or supporting data). "The critical inquiry is whether there is a connection between the data employed and the opinion offered" and whether the expert employed "those kinds of facts or data on which experts in the field would reasonably rely." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (internal quotation omitted); *see also* Fed. R. Evid. 703.

In part, Dr. Graham opines that the pressure from the patient's seatbelt caused her cardiac arrest. Home-Owners says this opinion lacks a sufficient factual basis. The insurer argues that this opinion looks past the seatbelt the patient wore, her size, her type of car, whether she had bruises on her chest, and any calculations of force at work during the collision. Kindred says Home-Owners is mischaracterizing Dr. Graham's opinion. He instead proposes to testify that the trauma of the accident, whether through the seatbelt or the collective impact of a serious accident, caused her cardiac arrest—an opinion based on Dr. Graham's extensive review of her medical records, relevant medical literature, key medical findings, and his near fifty-year experience.

Home-Owners' concerns go to weight, not admissibility. An opinion witness must have sufficient facts or data to support his opinion, but the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). Reliability often focuses on the witness's methodology, "not the quality of the data used in applying the methodology or the conclusions produced." *Id.* The data here is reliable nonetheless. The protocol for raising these

concerns of Home-Owners is crossexamination at trial. *See Daubert*, 509 U.S. at 596. This isn't a situation in which Dr. Graham proposes an opinion without sufficient facts. *See, e.g., Stollings*, 725 F.3d a 766 ("if an expert seeks to testify about an average gross sales price but is going to base the testimony on sales to only a single customer, a court would appropriately exclude the testimony because a single observation does not provide a sufficient basis for calculating an average").

Dr. Graham bases his causation opinion on the patient's medical records; clinical appeals; physician progress notes; pharmaceutical administration records; the accident report; medical textbook entries on sudden cardiac death, ventricular fibrillation, and chest trauma; medical articles; consultations with other physicians; all then seen through the lens of his almost fifty years of experience in pulmonary critical care and internal medicine. From these myriad sources, he observes that the patient, who was obese but not otherwise at a higher risk for a spontaneous heart attack, suffered trauma to her chest wall, as demonstrated by a partial collapsed lung, a lung contusion, six fractured ribs, and elevated troponin levels (a specific enzyme associated with frontal cardiac damage). Home-Owners doesn't argue that a physician would rely on other evidence to form an opinion, or that these telltale indicia of trauma were outside those customarily considered by doctors in Dr. Graham's field.

Based on his experience as a physician specializing in critical care pulmonology and internal medicine, as well as his review of the relevant literature, Dr. Graham says trauma to the chest wall can cause cardiac arrest and a car barreling into a utility pole at 56 miles per hour imparted enough trauma to trigger cardiac arrest in this patient. This opinion proves well within his wheelhouse—and one built robustly on a panoply of medical information. Dr. Graham opines that it would be "distinctly unusual for any 35-year-old with [her medical] history, let alone a woman, to go into [ventricular fibrillation] in the absence of trauma (or other provocation) like the [p]atient experienced during her motor vehicle accident"—something too that rests on a sound factual basis. Indeed, despite nearly fifty years of

practice, Dr. Graham could not recall ever treating an individual like the patient for unprovoked cardiac arrest. His opinion—that medically the most probable cause of the patient's cardiac arrest and ensuing hospitalization was trauma to the heart, thorax, and lungs and the physiologic stress of the collision—rests on sufficient data, scientific literature, and his significant medical experience. To the extent that Home-Owners believes that a physician's opinion of this nature requires a foray into Newtonian physics or other principles of biomechanics, the company has crossexamination at its disposal.

      C.     *Dr. Graham's Proposed Opinion is Reliable.*

Expert testimony must originate from reliable principles and methods. Fed. R. Evid. 702(c). *Daubert* helps "to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996); *accord Kumho Tire*, 526 U.S. at 152. Scientific or medical testimony may be validated if the theory or technique can be or has been tested, if it has been subjected to peer review and publication, if it has a known or potential error rate, and if it enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *Gopalratnam*, 877 F.3d at 779.

In the context of medical causation testimony, a physician will often employ differential etiology—a known and accepted methodology to determine the cause of a medical event. *Robinson v. Davol Inc.*, 913 F.3d 690, 696 (7th Cir. 2019) (citing *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). Applying "differential etiology, the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment." *Myers*, 629 F.3d at 644. The reliability of such medical causation opinion focuses on "which potential causes should be 'ruled in' and which should be 'ruled out.'" *Id.* (citing *Ervin*, 492 F.3d at 904).

To apply this methodology, a physician must first establish the reliability of a potential cause to "rule in" that cause for consideration among the candidates and then must reliably "rule out" the candidates to arrive at his conclusion as to the most likely cause. *See Robinson*, 913 F.3d at 696; *Ervin*, 492 F.3d at 904. The court has discretion to consider whether the proposed expert has adequately accounted for obvious or other reasonable explanations. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014). "The expert need not exclude all alternatives with certainty" because a physician, like other court-approved experts, will testify to a reasonable degree of certainty—the cause that the record establishes is more likely true than not. *Id.*

Home-Owners argues that Dr. Graham's methodology is unreliable because he made no effort to determine all potential causes of the patient's cardiac arrest and then eliminate them and he cannot cite any medical studies to support his trauma theory. Kindred responds that Dr. Graham properly employed differential etiology.

The court starts with the "ruling in" phase. Dr. Graham starts with the proposition that blunt force trauma, underlying disease, various biochemical and electrolyte imbalances, hypoxemia, and shock all can reasonably lead to ventricular fibrillation—his catalogue of candidates under the rubric of general causation. He testified that a "vast majority" of individuals who suffer ventricular fibrillation have an underlying disease and the proportion of individuals who experience idiopathic ventricular fibrillation—that with no known cause—is "very small" and "primarily male dominated."

That blunt force trauma can cause ventricular fibrillation isn't novel. Dr. Graham cites no specific study for this conclusion but explains that "everyone [in the medical profession] knows" it. Though an opinion witness cannot rely merely on his say-so, even a brief survey of medical literature demonstrates the link between chest wall injury and ventricular fibrillation (commotio cordis)—from sporting injuries, traumatic falls, and motor vehicle accidents. In addition, Home-Owners' proffered expert acknowledges the existence of medical literature describing blunt force chest trauma as causing

ventricular fibrillation, albeit in the context of smaller forces [ECF 80-12 at 48-49], and Home-Owners' medical review further echoed this conclusion [ECF 80-6 at 3 ("Vfib . . . can be caused by blunt force trauma. . . which would have been a result of the [motor vehicle collision].").

Perhaps recognizing this, Home-Owners focuses on the particular mechanisms of physical trauma sufficient to trigger the patient's cardiac event, arguing that Dr. Graham presented a novel theory—the airbag or the seatbelt caused her ventricular fibrillation—without also providing support in the literature or quantitatively substantiating that any component of the accident applied sufficient force to initiate the cardiac event. But Dr. Graham's testimony is broader than just a theory built on trauma from a seatbelt or an airbag. Instead, it encompassed the entire biophysical trauma on the patient's body from the crash. This patient suffered massive trauma from driving into a pole at 56 miles per hour, resulting in bilateral rib fractures (six total), pulmonary contusions, a collapsed lung, and biochemical signs of heart trauma. There is nothing unreliable about ruling in trauma as a reasonable cause of ventricular fibrillation, particularly given these medical findings and the trauma theory's support in the medical community, peer review, and publication.

The court thus turns to the "rule out" phase. Home-Owners argues that Dr. Graham ignored other potential causes before concluding that the patient's cardiac arrest was caused by chest wall trauma. The obvious alternative cause, Home-Owners says, is some undiagnosed underlying ailment or chemical imbalance.

To apply differential etiology, Dr. Graham needed to exclude these alternative explanations reliably by explaining why they weren't medically probable. *See Brown*, 765 F.3d at 773. He looked at the patient's medical history and the known circumstances leading up to, and immediately after, the accident. He noted her obesity, hypertension, and a slight swelling of her heart, though she lacked any underlying disease known to increase her risk of heart attacks and had an otherwise normal functioning heart. He noted that the patient had been prescribed diuretics, but there was no evidence to suggest

she had taken them (and her husband indicated she wasn't). Dr. Graham considered the impact of obesity and her preexisting medical conditions on the patient's risk for a heart attack, but concludes that absent an underlying condition, these factors alone would not place her at higher risk. He also examined the patient's physiological characteristics, such as gender, age, and reported symptoms before the crash, concluding that it was unlikely that a young woman without an underlying heart condition or a family history of heart conditions would spontaneously fall into ventricular fibrillation. This is a point with which Home-Owners' proffered expert seems to concur [ECF 80-14 at 52 (noting that it would be "very rare" for a 35-year-old woman with no underlying disease to suffer a spontaneous cardiac arrest)].

Dr. Graham also cites to the timeline of events to bolster his medical causation opinion. He concludes that the patient was not in ventricular fibrillation when speaking with her husband immediately before the accident, despite noting that she felt dizzy, because ventricular fibrillation causes unconsciousness and she did not report to her husband any other symptoms likely to occur before a cardiac event such as pain or discomfort in her chest, arms, back, neck, jaw, or stomach, vomiting, or shortness of breath. Dr. Graham could not "imagine a scenario whereby the Patient went from driving, speaking and feeling dizzy directly to [VF] in the absence of the trauma suffered in that accident" [ECF 77-3 at 4]. Again, this is a point with which Home-Owners' proffered expert agrees [ECF 80-14 at 87 (an individual experiencing ventricular fibrillation cannot talk)].

At his deposition, Dr. Graham testified that the amount of time between the patient's accident at 8:23 a.m. and when paramedics started CPR at 8:31 a.m. and defibrillated at 8:34 a.m. also counseled against a pre-accident cardiac event. Citing to the Advanced Cardiovascular Life Support (ACLS) manual, Dr. Graham stated that an individual cannot go without oxygen for more than four to five minutes without experiencing brain injury [ECF 77-2 at 101-03; ECF 80-10 at 2 (brain damage from lack of oxygen: 4-6 minutes no damage, 6-10 minutes damage likely, 10 minutes damage irreversible)].

Had ventricular fibrillation precipitated the accident, the patient would have been without oxygen for over 9 minutes before CPR was initiated, and over 11 minutes before defibrillation was administered. In Dr. Graham's opinion, had the patient been without oxygen this long, she would not have survived [ECF 77-2 at 102-03].

Finally, Dr. Graham notes that the vehicle's black box indicated that it accelerated just before the accident. This fact also counseled against a pre-accident cardiac event because an unconscious person cannot press an accelerator [ECF 77-2 at 161]. Based on these considerations, he ruled out alternative causation theories, and concluded it was "medically most probable that the trauma of the impact to the heart, thorax and lungs of the Patient and physiologic stress of the automobile collision were the cause of the Patient's cardiac arrest" and the "blunt chest wall trauma [was] overwhelmingly the likely cause of her ventricular fibrillation/cardiac arrest" [ECF 77-3 at 4-5]. Home-Owners has not shown that these ruling out deliberations were unreliable in any way.

The insurer's arguments go to weight, not admissibility. For instance, Home-Owners argues that Dr. Graham does not know how long before the accident the patient was speaking with her husband, and that she could have finished speaking, then gone into ventricular fibrillation and crashed her car. That strikes the court as speculative in argument. On this record the company has not demonstrated what caused the call to end, and its speculation that the conversation ended naturally isn't a basis to undermine the sound rationale that Dr. Graham offers to exclude a pre-accident cardiac event. The trial might present additional facts, but that will bear on the jury's determination of weight, not the court's determination of reliability.

Home-Owners also argues that Dr. Graham isn't an expert in cars or physics such that his assumption that an unconscious individual cannot press an accelerator is based on guesswork. This point really goes to neither admissibility nor weight because even a jury will understand that an unconscious individual by definition is incapable of acting intentionally. That isn't guesswork, but

13

common sense. The argument here seems no more sophisticated. For instance, Home-Owners isn't saying an unconscious individual could slump forward, apply greater pressure to the gas pedal, and thus accelerate the vehicle. Even so, that point would go to crossexamination and weight.

Home-Owners also argues that Dr. Graham's assessment is flawed because he doesn't explain why he ruled out a pre-collision heart attack when the evidence, according to Home-Owners, is entirely consistent with someone who had a heart attack before hitting the utility pole. But Dr. Graham's opinion is based on his application of differential etiology to conclude what caused the patient's heart attack. He reached this opinion by examining the likely causes of ventricular fibrillation and then systematically ruling them out based on the patient's history and the circumstances of the accident, ultimately rejecting Home-Owners' theory of causation by concluding she had no underlying predisposition to heart attacks [ECF 77-3 at 4], her only reported symptom was dizziness that could not have been communicated to her husband while in VF [ECF 77-3 at 4-5], was likely conscious because she pressed the accelerator [ECF 77-2 at 161], and that the time the patient would have been without oxygen (had the cardiac incident occurred before the crash) would have been most likely fatal (though she didn't die) [ECF 77-2 at 102-03]. Home-Owners may not agree with his conclusion, but the company's disagreement does not go to admissibility.

Home-Owners notes that Dr. Graham's opinion further lacks reliability because he bases his opinion only on his experience with own patients; but Dr. Graham testified that in addition to his own experience, he reviewed medical texts and literature about sudden cardiac death, ventricular fibrillation, and chest trauma, the panoply of source data here, as well as conferred with a cardiologist, an electrophysiologist, and another pulmonologist who concurred with his conclusions. He could properly rely on these other physicians in peer review or in gathering additional data so long as he isn't a mouthpiece for their expertise. In short, Dr. Graham's sources are hallmarks of reliability that, with many other indicia of reliability, signal to the court to open its gate. *Gopalratnam*, 877 F.3d at 779-80.

CONCLUSION

Dr. Drayton Graham's proffered opinion on medical causation is both reliable and helpful under Rule 702. Accordingly, the court DENIES Home-Owners' motion to exclude his testimony [ECF 76].

SO ORDERED.

November 17, 2021                              _s/ Damon R. Leichty_
                                              Judge, United States District Court